FILED

2009 Mar-20  PM 03:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION


Freddy Locarno Baloco, through his guardian
and representative Yaneth Ester Baloco Tapia;
Katherine Paola Lacarno Baloco, through her
guardian and representative Yaneth Ester Baloco Tapia;
Ayleen Paoloa Orcasita Almarales;
Stefany Loren Orcasita Cordoba;
Marlon Alexi Orcasita Almarales, through his guardian and
representative Elisa Almarales Viloria;
Ashly Patricia Orcasita Almarales, through her guardian and
representative, Elisa Almarales Viloria; Sergio Esteban
Soler Urrego;  Ingrid Karina Soler Urrego,
through her guardian and representative,
Nubia Yolanda Urrego Urrea,

      Plaintiffs,

v.                Case Number:

Drummond Company, Inc.; Drummond Ltd.;     JURY TRIAL
Augusto Jimenez; and Alfredo Araujo,        REQUESTED

      Defendants.


**COMPLAINT FOR EQUITABLE RELIEF AND DAMAGES**

**I. INTRODUCTION**

1.    Plaintiffs are children of Valmore Locarno Rodriquez (hereinafter

Locarno), Victor Hugo Orcasita Amaya (hereinafter Orcasita), and Gustavo Soler

Mora (hereinafter Soler), who were union leaders and employees of Drummond Company, Inc. and Drummond Ltd. (collectively, "Drummond") and were assassinated by paramilitaries of the United Self-Defense Forces of Colombia (hereafter "AUC"), hired by Drummond. Plaintiffs bring this action against the Drummond Defendants for equitable relief and damages.

2.     This case is brought under the Alien Tort Claims Act (ATS), Torture Victims Protection Act (TVPA), 28 U.S.C. § 1350, and Colombian wrongful death law, and seeks to remedy the violent persecution of trade unionists working at the Drummond facilities in Colombia. These facilities include the coal mine in Valledupar, Colombia, the rail line connecting the coal mine to the port near Santa Marta, Colombia, and Puerto Drummond, the company-owned port used to load coal on shipping barges. Drummond has been knowingly engaged in an ongoing campaign of terror against trade unionists in Colombia.

3.     Drummond has hired, contracted with and directed AUC paramilitary forces to use extreme violence, including against trade union leaders, to protect their property, assets and profits. Locarno, Orcasita, and Soler were murdered by paramilitaries employed by and working for the Drummond Defendants. Defendants directed the paramilitaries to carry out these killings to eliminate effective leaders of the trade union representing Drummond workers, and to intimidate other workers from joining the union or assuming a union leadership

position.   The murders of Locarno, Orcasita, and Soler are extrajudicial killings in violation of the ATS, the TVPA, international human rights law and Colombian law.

4.      Plaintiffs do not have access to an independent or functioning legal system within Colombia to raise their complaints.  Any efforts by Plaintiffs to seek redress would be futile because those seeking to challenge official or paramilitary violence, including prosecutors and prominent human rights activists, are at great risk of retaliation.    In particular, there is almost complete legal impunity for the murder of trade unionists in Colombia.

5.      Prior to their murders, Locarno, Orcasita and Soler sought the assistance and protection of the Colombian Administrative Department of Security (DAS) – the government organization tasked at the time to protect unionists under threat -- citing threats of death against them and their colleagues.  Not only was no action taken by the DAS to redress these concerns, subsequent evidence indicates the DAS was actually collaborating with the paramilitaries, was funneling money to them and was providing the paramilitaries with lists of unionists to kill on behalf of politically and economically powerful individuals.

6.      In fact, the collaboration between the AUC and the government of Colombia goes to the highest levels and ensures that no serious action will be taken to bring to justice in Colombia those involved in the murders alleged herein.

Indeed, the administration of Colombian President Alvaro Uribe is under pressure from outside Colombia, including from the U.S., due to the ongoing "para-political" scandal which has implicated numerous high-ranking government officials, including 60 congressional representatives aligned with Uribe, and high-ranking military officers in collaborating with paramilitaries and shielding paramilitaries from justice. However, within Colombia, it is business as usual. According to a Human Rights Watch (HRW) report issued in November, 2008, entitled, *Breaking the Grip? Obstacles to Justice for Paramilitary Mafias in Colombia*, Human Rights Watch explains that

> In Colombia, more than in almost any country in the Western hemisphere, violence has corroded and subverted democracy. Too often, killings and threats - not free elections or democratic dialogue - are what has determined who holds power, wealth in the country. Nowhere is this more evident than in the relationship between paramilitary groups and important sectors of the political system, the military and the economic elite.

> Paramilitary groups have ravaged much of Colombia for two decades. Purporting to fight the equally brutal guerillas of the left, they have massacred, tortured, forcibly 'disappeared,' and sadistically killed countless men, women, and children. Wherever they have gone, they have eliminated anyone who opposed them, including thousands of trade unionists, human rights defenders, community leaders, judges and ordinary civilians.

7.    In this same report, HRW blames the "para-political" phenomenon for the extensive paramilitary violence throughout the country. As HRW explains, "[t]he close military-paramilitary collaboration in several regions allowed the

paramilitaries to commit massacre after massacre of civilians largely unimpeded and with impunity." HRW further relates that President Uribe himself has been a major obstacle to the efforts of the Colombian Supreme Court to investigate and punish government officials for collaborating with the paramilitaries. As HRW states, "President Uribe has [r]epeatedly launched personal attacks on the Supreme Court and its members in what increasingly looks like a concerted campaign to smear and discredit the Court; [o]pposed and effectively blocked meaningful efforts to reform the Congress to eliminate paramilitary influence; [p]roposed constitutional reforms that would remove the 'parapolitics' investigations from the jurisdiction of the Supreme Court."

## II.  JURISDICTION AND VENUE

8.      This Court has federal jurisdiction pursuant to 28 U.S.C. §1331, based on the ATS and TVPA, 28 U.S.C. §1350, for the violations of international human rights law.   Supplemental jurisdiction exists over the claim for wrongful death under Colombian law, pursuant to 28 U.S.C. §1367.

9.      Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b) and © as Defendants Drummond Company, Inc. and Drummond Ltd. are Alabama corporations, with their principal places of business in Alabama.

## III. PARTIES

### A. Plaintiffs

10.    Plaintiff Freddy Locarno Baloco, a minor, seeks damages and equitable relief for the death of his father, Locarno, who was a citizen and resident of Colombia and was murdered on March 12, 2001.   He brings this case, through his mother, Yaneth Ester Baloco Tapia, who is his guardian and representative in this case, for his own personal damages suffered as the result of the murder of his father. He was not a party to any prior legal action brought against the Drummond Defendants for the murder of his father, and he has the status of a legal beneficiary following his father's death under federal common law, international law, and the law of Colombia. He resides in Canada, having fled there with his family and obtaining refugee status following threats to the family from the AUC when the family and the union complained to government authorities about the failure of the government to investigate or prosecute the AUC for the murder of Locarno when it was common knowledge in Colombia that the highest levels of the AUC, including Jorge 40, planned the murders of the Drummond union leaders at the behest of the Drummond Defendants.

11.    Katherine Paola Locarno Baloco, a minor, seeks damages and equitable relief for the death of her father, Locarno, who was a citizen and resident

of Colombia and was murdered on March 12, 2001. She brings this case, through her mother, Yaneth Ester Baloco Tapia, who is her guardian and representative in this case, for her own personal damages suffered as the result of the murder of her father. She was not a party to any prior legal action brought against the Drummond Defendants for the murder of her father, and she has the status of a legal beneficiary following her father's death under federal common law, international law, and the law of Colombia. She resides in Canada, having fled there with her family and obtaining refugee status following threats to the family from the AUC when the family and the union complained to government authorities about the failure of the government to investigate or prosecute the AUC for the murder of Locarno when it was common knowledge in Colombia that the highest levels of the AUC, including Jorge 40, planned the murders of the Drummond union leaders at the behest of the Drummond Defendants.

12.    Ayleen Paoloa Orcasita Almarales, an adult individual of 20 years of age, seeks damages and equitable relief for the death of her father, Orcasita, who was a citizen and resident of Colombia and who was murdered on March 12, 2001. She brings this case for her own personal damages suffered as the result of the murder of her father. She was not a party to any prior legal action brought against the Drummond Defendants for the murder of her father, and she has the status of a legal beneficiary following her father's death under federal common law,

international law, and the law of Colombia. She resides in Colombia, but has moved several times after the death of her father because of threats to the family from the AUC when the family and the union complained to government authorities about the failure of the government to investigate or prosecute the AUC for the murder of Orcasita when it was common knowledge in Colombia that the highest levels of the AUC, including Jorge 40, planned the murders of the Drummond union leaders at the behest of the Drummond Defendants.

13.    Stefany Loren Orcasita Cordoba, an adult individual of 20 years of age, seeks damages and equitable relief for the death of her father, Orcasita, who was a citizen and resident of Colombia and who was murdered on March 12, 2001. She brings this case for her own personal damages suffered as the result of the murder of her father. She was not a party to any prior legal action brought against the Drummond Defendants for the murder of her father, and she has the status of a legal beneficiary following her father's death under federal common law, international law,  and the law of Colombia. She resides in Colombia, but has moved several times after the death of her father because of threats to the family from the AUC when the family and the union complained to government authorities about the failure of the government to investigate or prosecute the AUC for the murder of Orcasita when it was common knowledge in Colombia that the

highest levels of the AUC, including Jorge 40, planned the murders of the Drummond union leaders at the behest of the Drummond Defendants.

14.     Marlon Alexi Orcasita Almarales, a minor child, seeks damages and equitable relief for the death of his father, Orcasita, who was a citizen and resident of Colombia and who was murdered on March 12, 2001. He brings this case through his mother, Elisa Almarales Viloria, who is his guardian and representative in this case, for his own personal damages suffered as the result of the murder of his father. He was not a party to any prior legal action brought against the Drummond Defendants for the murder of his father, and he has the status of a legal beneficiary following his father's death under federal common law, international law,  and the law of Colombia. She resides in Colombia, but has moved several times after the death of her father because of threats to the family from the AUC when the family and the union complained to government authorities about the failure of the government to investigate or prosecute the AUC for the murder of Orcasita when it was common knowledge in Colombia that the highest levels of the AUC, including Jorge 40, planned the murders of the Drummond union leaders at the behest of the Drummond Defendants.

15.     Ashly Patricia Orcasita Almarales, a minor child, seeks damages and equitable relief for the death of her father, Orcasita, who was a citizen and resident of Colombia and who was murdered on March 12, 2001. She brings this case

through her mother, Elisa Almarales Viloria, who is her guardian and representative in this case, for her own personal damages suffered as the result of the murder of her father. She was not a party to any prior legal action brought against the Drummond Defendants for the murder of her father, and she has the status of a legal beneficiary following her father's death under federal common law, international law, and the law of Colombia.   She resides in Colombia, but has moved several times after the death of her father because of threats to the family from the AUC when the family and the union complained to government authorities about the failure of the government to investigate or prosecute the AUC for the murder of Orcasita when it was common knowledge in Colombia that the highest levels of the AUC, including Jorge 40, planned the murders of the Drummond union leaders at the behest of the Drummond Defendants.

16.     Sergio Esteban Soler Urrego, an adult person of 22 years of age, seeks damages and equitable relief for the death of his father, Soler, who was a citizen and resident of Colombia and who was murdered in October 2001. He brings this case on his own behalf for his own personal damages suffered as the result of the murder of his father. He was not a party to any prior legal action brought against the Drummond Defendants for the murder of his father, and he has the status of a legal beneficiary following his father's death under federal common law, international law, and the law of Colombia.   He resides in Colombia, but has

moved several times after the death of his father because of threats to the family from the AUC when the family and the union complained to government authorities about the failure of the government to investigate or prosecute the AUC for the murder of Soler when it was common knowledge in Colombia that the highest levels of the AUC, including Jorge 40, planned the murders of the Drummond union leaders at the behest of the Drummond Defendants.

17.     Ingrid Karina Soler Urrego, a minor child, seeks damages and equitable relief for the death of her father, Soler, who was a citizen and resident of Colombia and who was murdered in October 2001. She brings this case through her mother, Nubia Yolanda Urrego Urrea, who is her guardian and representative in this case, for her own personal damages suffered as the result of the murder of her father. She was not a party to any prior legal action brought against the Drummond Defendants for the murder of her father, and she has the status of a legal beneficiary following her father's death under federal common law, international law, and the law of Colombia.  She resides in Colombia, but has moved several times after the death of her father because of threats to the family from the AUC when the family and the union complained to government authorities about the failure of the government to investigate or prosecute the AUC for the murder of Soler when it was common knowledge in Colombia that the

highest levels of the AUC, including Jorge 40, planned the murders of the Drummond union leaders at the behest of the Drummond Defendants.

## B. Defendants

18. Defendant Drummond Company, Inc. is a for-profit corporation incorporated in Alabama that is engaged primarily in the mining and shipment of coal. It is a closely-held corporation owned by the Drummond family, and is controlled in its day-to-day operations by Garry N. Drummond. Its principal place of business is located at 530 Beacon Parkway, Suite 900, Birmingham, Alabama 35209. Among other places, Drummond Company, Inc. owns and operates a large coal mine, rail line and port in Colombia, South America. The operations in Colombia are financed and managed from the Alabama headquarters of Drummond Company, Inc., and the profits from the Colombia operations revert to Drummond Company, Inc.

19. Defendant Drummond Ltd. is an Alabama company, incorporated in Jasper, Alabama, and has its principal place of business at 3000 Highway 78, Jasper, Alabama 35501. It is wholly-owned by Drummond Company, Inc. Drummond Ltd. manages the day-to-day operations of the Drummond coal operations in Colombia, but is at all times operating under the complete ownership, direction and control of Defendant Drummond Company, Inc. Fully aware of the violence in Colombia, particularly anti-union violence, and the absolute impunity

afforded the perpetrators of such violence in Colombia, Drummond Company, Inc. created Drummond Ltd. for the sole purpose of operating the Colombian mines for the sole benefit of Drummond Company, Inc. while also attempting to shield Drummond Company, Inc. from liability for any and all tortious conduct committed by the management of these mines. The creation of Drummond Ltd. was a sham done for the aforesaid unlawful purpose.

20.    Defendant Augusto Jimenez is the President of Defendant Drummond Ltd. At all material times herein, Jimenez was a direct participant in Drummond's plan to make significant payments to the AUC, specifically to murder the three trade union leaders Locarno, Orcasita, and Soler, and more generally to provide support to the AUC to provide "security services" at the company mine and along its railroad line.

21.    Defendant Alfredo Araujo is a Vice President at Drummond Ltd., and among other positions, is Director of Community Relations. He has been close friends with the AUC Commander "Jorge 40" since childhood. Defendant Araujo used this relationship to make the initial arrangement with Jorge 40 to provide security for Drummond. Araujo made the plan with Jorge 40 and then used his position in the company to get Defendant Jimenez and others to agree to the plan to make substantial payments to the AUC. Araujo, on behalf of Drummond, shared

with AUC the goal of using the ongoing civil conflict as a cover to execute leftist union leaders, including those employed by Drummond.

22.    Defendant Drummond Company, Inc. is jointly and severally liable for all of the tortious actions committed when its alter ego and/or agent, Drummond Ltd., acts in concert with any other person or entity in furtherance of Drummond Company, Inc.'s business interests and activities.

23.    The AUC paramilitary forces that murdered Locarno, Orcasita and Soler were acting within the course and scope of a business relationship with Defendants with the advance knowledge, acquiescence or subsequent ratification of Defendants.

## IV.  BACKGROUND FACTS CONCERNING VIOLENCE AGAINST TRADE UNION LEADERS AND MEMBERS IN COLOMBIA

24.    Colombia is widely-known as a country that is torn by a long-standing civil war involving armed leftist groups on the one side, and the Colombian military as well as right-wing paramilitaries on the other.   It is universally acknowledged that the regular military in Colombia, and the civil government authorities, tolerate the paramilitaries, allow them to operate, and often cooperate, protect and/or work in concert with them. The extent of the civil conflict is so pervasive that the country's civil war necessarily must be governed by the rules of war so that the combatants, the right-wing paramilitaries, the leftist guerillas, and

the regular military are governed by Article 3 of the Geneva Convention, which applies to "an armed conflict not of an international character." Thus, noncombatants to the Colombian civil war, including the Plaintiffs herein, standing in the place of the deceased, are protected from human rights violations and other war crimes committed by any parties to the conflict, regardless of whether the combatant parties are formally recognized as government officials. This includes the paramilitary forces which clearly are major participants in the civil conflict.

25.    The paramilitaries in Colombia, including those directly involved in the wrongful acts alleged herein, were created based on official sanction of the Government of Colombia. Under "Law 48," passed in 1968, the Defense Ministry was authorized to create and provide weapons to civil patrols. Most of the paramilitary groups were created and sustained under the authority of this law. In 1989, the Colombian Supreme Court of Justice declared Law 48 unconstitutional. However, 21 years of close, lawful, and open collaboration allowed the Colombian Armed Forces and the paramilitaries to create solid and lasting relationships.

26.    Moreover, in 1994 the Colombian government effectively re-legalized paramilitary organizations in Decree 356, which established the "Special Vigilance and Private Security Services." This decree laid the foundation for the creation of the Convivir groups, officially launched in 1995 through Resolution 368. The Convivir groups are comprised of civilians who petition the government for a

license to "provide their own security. . . in areas of high risk or in the public interest, which requires a high level of security." Defense Ministry, Decree 356, República de Colombia, February 11, 1994, pp. 19-20; and Resolution 368, April 27, 1995. Convivir members interviewed by Human Rights Watch confirmed that they regularly supply the Colombian army with intelligence, routinely collaborate with Colombian security forces, and are supervised by a government agency within the Defense Ministry.     One Convivir commander stated frankly, "We are paramilitaries, machetes, or Convivir, whatever the hell you want to call us." Human Rights Watch, *War Without Quarter: Colombia and International Humanitarian Law* (1998).

27.     Paramilitary groups continue to thrive and enjoy *de facto* approval from the government, and the Colombian military often outsources its "dirty work" to the paramilitaries in an attempt to clean up its own international image.

28.     The paramilitaries in Colombia have a mutually-beneficial, symbiotic relationship with the Colombia government's military. As reported by Human Rights Watch, 78% of the murders in Colombia from October 1999 to March 2000 were attributable to the paramilitaries. The Human Rights Watch investigators found "detailed, abundant, and compelling evidence of continuing close ties between the Colombian Army and paramilitary groups responsible for gross human rights violations." The facts supporting the ongoing symbiotic relationship

between the military and paramilitaries in Colombia include that active and retired

military actually set up paramilitary units, the military provides the paramilitaries

with weapons, intelligence, and supplies, and the paramilitaries conduct missions

at the request of the military.

29. The close, symbiotic relationship between the military and

paramilitaries in Colombia is so widely acknowledged that the U.S. State

Department confirms this fact without reservation:

> Credible allegations of cooperation with paramilitary groups,
> including instances of both silent support and direct collaboration by
> members of the public security forces, in particular the army,
> continued. Evidence suggests that there were tacit arrangements
> between local military commanders and paramilitary groups in some
> regions, and paramilitary forces operated freely in some areas that
> were under military control or despite a significant military presence.
> Individual members of the security forces actively collaborated with
> members of paramilitary groups – passing them through roadblocks,
> sharing intelligence, providing them with ammunition, and allegedly
> even joining their ranks while off-duty.

30. In the February 28, 2002 Report of the UN High Commissioner for

Human Rights on the human rights situation in Colombia ("UNHCR Report"), the

UN High Commission explains that the links between the paramilitaries and the

State continue and indeed are intensifying. As the UNHCR Report explains:

> During 2001, the Office continued to observe that paramilitary
> activity was strengthening and spreading throughout much of the
> country's territory. ... Toleration, support and complicity on the part
> of public servants, as well as non-fulfillment of their duty to safeguard

rights, with respect to several acts by these groups, means that the State continues to bear responsibility.

The UNHCR Report further relates that "the growth in paramilitary activity has been aided by the State's inaction or slow reaction in preventing the formation of illegal armed groups, and in keeping new territories from falling into the de facto control of these organizations." Finally, the UNHCR explains that the growth in paramilitary control and violence has been assisted by the impunity which human rights violators receive in the Colombian judicial system. Thus, the UNHCR states that, throughout 2001, it "continued to receive troubling reports of ties between members of the security forces and elements of the paramilitary groups. The existence of pending criminal and disciplinary investigations of members of the security forces shows how widespread these relationships are. However, the investigations have not led to any determination of responsibility or the application of relevant sentences and punishments to ensure that these acts do not benefit from impunity."

31.    The UNHCR reached the very same conclusions in its recent, March 18, 2003 report, stating that there remain "open collusion" on the part of Colombian security forces with paramilitaries and that there is continued "expansion and consolidation of paramilitaries in several areas."

32.    Further, in *Country Reports on Human Rights Practices – Colombia* (March, 2002), the U. S. State Department, which had in September 2001

designated the AUC, the chief and largest paramilitary group as a "terrorist" group, continued to conclude that "in some locations elements of the state security forces tolerated or even collaborated with paramilitary forces." The State Department reached this same conclusion in its Report of March 31, 2003, stating that "[s]ome members of the security forces collaborated with paramilitary groups that committed serious abuses."

33.    For a number of years, the location in which Defendants operate in Colombia, the Cesar Province, has been one of these locations where the collaboration between the state security forces and the paramilitary forces is especially keen. Thus, Amnesty International has reported that it "has been increasingly concerned by the escalation in human rights violations carried out in the Department of Cesar by members of the security forces and paramilitary allied to them. 'Disappearances,' extrajudicial executions and other human rights violations continue to be reported as the security forces have increased their presence and paramilitary organizations have been set up and consolidated in the region, sometimes with the support of powerful economic interests." Indeed, Drummond allowed its vast property around its coal mine to serve as a joint base for the military and AUC in that area, and there was frequent collaboration between the military and the AUC due to Drummond's provision of a safe haven for the AUC.

34.     The close, symbiotic relationship between the military and paramilitaries in Colombia is such that the paramilitaries are acting under color of the authority of the government of Colombia.  The paramilitaries in Colombia, including those who committed the wrongful acts alleged herein, are legal creations of the government of Colombia, and they act with support from and cooperation with the official military.

35.     The paramilitaries in Colombia are particularly well-known for murdering, abducting and torturing trade union leaders who they view as being subversives.  The paramilitaries' characterization of trade unionists as subversives is in accord with the view of the Colombian government which, in Decree 180, has designated leftist trade union leaders as "terrorists."  As a result, in the words of the International Confederation of Free Trade Unions in their 2002 Report ("ICFTU Report"), Colombia is "the most dangerous place in the world to be a trade union activist."  And, as the ICFTU notes, these trade unionists are being murdered by very virtue of the fact that they are trade unionists – that is, they are not merely being caught in the cross-fires of the armed conflict in Colombia; they are targets, particularly of the paramilitaries which are "hostile towards the unions."

36.     Amnesty International, in specifically describing the human rights situation in the Cesar Province – the area in which the acts described herein took

place – explains that "[t]he systematic violation of human rights against members of popular organizations. . .in the department of Cesar corresponds to a national strategy of undermining organizations which the [state] security forces deem to be subversive." Amnesty International further finds that "[m]any violations of human rights in the [Cesar] region are committed in order to advance and protect the interests of economically powerful sectors. Labeling anyone who dares to challenge the interests of powerful economic sectors as subversive. . .and then targeting them for human rights violations provides a means for those sectors to protect their interests." Recently, the UNHCR has confirmed this assessment of Amnesty International, noting in the same breath that "members of paramilitary groups have been blamed for most of the [ ] violent deaths" suffered by trade unionists and that Cesar is one of "[t]he departments most affected by anti-union violence. . ."

37. The paramilitaries' targeting of thousands of individuals for assassination, including Locarno, Orcasita and Soler, simply because of their status as trade unionists, constitutes war crimes. The paramilitaries are able to execute trade unionists with impunity, including Locarno, Orcasita and Soler, because of the lawless environment in Colombia created by the ongoing civil conflict.

38. As a consequence of the official vilification of trade unionists by the Colombian government, which serves as an open invitation to paramilitaries to

target trade union leaders with violence, Colombia has led the world in the number of murders of trade unionists for the past ten years.

39.     As more fully explained below, the Drummond Defendants took advantage of the fact that paramilitaries target trade unionists in Colombia to prevail upon these paramilitaries to commit violent acts against the employees at the La Loma mines who held leadership positions in the union.  Defendants knew that, because of the lawless environment created by the civil conflict in Colombia, the paramilitaries acting as their agents, could murder trade unionists employed at their mines -- including Locarno, Orcasita and Soler – with impunity.  The ICFTU, in its 2002 report, noted with alarm that "[t]rade union activists affiliated to the Union of Workers of the Mining and Energy Industry of Colombia [SINTRAMIENERGETICA] and working at mines run by the US multinational Drummond have been particularly severely affected by the violence that occurred throughout 2001."

## V.  SPECIFIC EVENTS LEADING TO THE MURDERS OF LOCARNO, ORCASITA, AND SOLER

40.     Defendants Drummond Company, Inc. and Drummond Ltd. utilize the services of the Colombian military to protect its mining facilities, railway lines and U.S. workers in Colombia.  Drummond Company, Inc. and/or Drummond Ltd. actually support a military base on company property by providing the land, as well as electricity, fuel, and equipment.  The Defendant companies also maintain

the local roads used by the military. Defendants do so with specific knowledge that some of the local military supported by the company cooperate with the paramilitaries that also operate on the Drummond property and act on behalf of Drummond. Further, a significant number of these military personnel also are members of the paramilitaries operating in Valledupar, Colombia and elsewhere.

41.    In addition, Drummond Company, Inc. and Drummond Ltd., to protect its operations in the Cesar Department, engaged in a concerted effort to organize what was then a small and diffuse paramilitary operation in the region into a more powerful organization which had the capability to protect their property, assets, profits and personnel. Through Defendants' efforts and regular monetary support, a strong division of the AUC was created and became dominant in the region. Defendants have permitted this AUC division to freely enter and patrol their mining facilities with the full cooperation and support of the regular army which also provides security to the Drummond Defendants. Indeed, some of the regular military soldiers based on Drummond's property also are members of the AUC paramilitaries operating in and around the Drummond facilities. Pedro Maya, a Human Resources Manager for Drummond at the La Loma mines, has regular contacts and meetings with the AUC. Likewise, Defendant Alfredo Araujo, a community relations manager for Drummond, openly associates with paramilitaries, and coordinates their activities in the Cesar Department. The

Defendant companies provide supplies, including fuel, as well as monetary support to these paramilitaries.

42.     Shortly after the Drummond employees in Colombia successfully organized themselves into a union known as SINTRAMIENERGETICA, the Drummond Defendants decided to use the very paramilitaries which they helped establish as a force in the region to destroy this union.   In relevant part, key members of the Drummond Ltd. management – including Defendant Augusto Jimenez; Defendant Alfredo Araujo; Ricardo Urbina Aroca, Senior Human Resources supervisor; and Pedro Maya, Human Resources Manager at the La Loma mines – met with leaders of the AUC, including AUC Northern Bloc leader Jorge Cuarenta and his representatives, during the latter part of 2000 and the beginning of 2001 to arrange for the AUC to eradicate the union through violent means.   In furtherance of this conspiracy, this management made payments to the AUC as consideration for the AUC's carrying out this violent destruction of the union, including the murder of Locarno, Orcasita, and Soler.

43.     Locarno and Orcasita, President and Vice President, respectively, of the union, had been in heated negotiations with Defendants for nearly a year for a new contract.   In the course of the ongoing negotiations, pamphlets were passed out on and around the Drummond Company facilities in Colombia labeling SINTRAMIENERGETICA a "guerilla union," and attacking Locarno and Orcasita

as supporters of the guerillas. In a letter to Drummond Ltd., Locarno specifically protested that the pamphlets described above had been distributed around the La Loma mine in the Cesar Department of Colombia. He asked for security protection from the death threats he had been receiving. His request was denied by Drummond Ltd.'s Senior Human Resources supervisor, Ricardo Urbina Aroca, by letter dated October 6, 2000. In rejecting this request without explanation, Ricardo Urbina Aroca told Locarno, on behalf of Drummond Ltd., that "[w]e hope that the authorities can take measures that they consider appropriate regarding the situations raised by you all."

44. There were two persistent issues that were the subject of heated negotiations between SINTRAMIENERGETICA and the Drummond Company. First, the union demanded better security to protect them from the paramilitaries who had been hired or retained by Defendants to protect the Drummond rail lines and other facilities from attacks by guerillas operating in the area. The other contentious issue was that in the prior year, several Drummond workers were killed in a mining accident, and the company had failed to pay the compensation due their families under the laws of Colombia. During these negotiations, the President of the La Loma mines, Defendant Augusto Jimenez, made veiled threats against the union leaders, telling them on several occasions that "the fish dies from opening his mouth."

45.     Locarno met personally with Defendant Garry Drummond on the worker compensation issue on or about June 12, 2000, in Colombia.  Locarno and Orcasita had also written and faxed to Garry Drummond personally their concerns that their lives, and the lives of other union leaders and members, were in danger due to the presence of the violent paramilitary forces that were agents or employees of Defendants.  They also specifically notified other officials of the Drummond Company and/or Drummond Ltd., including, but not limited to, Defendant Augusto Jimenez, D. L. Lobb, General Manager of Drummond Ltd., and Mike Zerbos, an employee of Drummond Company, Inc. about their security concerns.

46.     The concerns expressed by Locarno and Orcasita to Garry Drummond and other representatives of Defendants were based on recent assassinations, kidnappings    and    torture    of    other    members    and    leaders    of SINTRAMIENERGETICA.  In the year prior to the murders of Locarno and Orcasita, Candido Mendez and Manuel Enrique Charris Ariza were also murdered by the paramilitaries. Locarno and Orcasita had made a very simple demand to be permitted to sleep at the coal mine, rather than being transported to nearby villages by bus, where they were exposed to the paramilitaries who control the local roads. This request, made to Garry Drummond and other Drummond officials, was denied despite the fact that Colombia's secret service agency, the DAS, had alerted

Drummond that Locarno and Orcasita were at risk of assassination and despite the fact that the DAS itself echoed their request to be able to sleep at the coal mine.

47.    Meanwhile, at other levels, the DAS itself is collaborating with the AUC paramilitaries, funneling money to these paramilitaries and actually encouraging them to kill unionists.  Indeed, at least one DAS official, Rafael Garcia, witnessed the payment of monies by a top Drummond official – an individual he believed to be than Drummond Ltd. President Augusto Jimenez – to Jorge Castro Pacheco, a sitting Colombian Senator and a representative of the AUC Northern Bloc commander Jorge Cuarenta.  It was clear from what was said at this meeting that the exchange of money was in return for the AUC's agreement to carry out the killings of Valmore Locarno and Victor Orcasita.  Yet, the DAS did nothing to prevent these killings though it was officially tasked to protect unionists by the Colombian government.

48.    Although Defendants flatly refused to improve security arrangements for the union leaders who had received specific death threats, Defendants made sure that the expatriate employees from the U.S. were never exposed to danger.  At all times material hereto, these U.S. employees were flown in and out of the Drummond mines and port on a private runway and provided with a compound where they lived and were protected by the military and private security forces 24 hours a day, 7 days a week.  At all times relevant hereto, Drummond's private

security forces, which guard both its operations and U. S. personnel, have themselves been led by active and former military personnel, including General Pena (chief of security for both the port and mines), Retired Colonel Jorge Garzon (chief of Security for the port) and Retired Colonel Edgar Ruiz.

49.     On March 12, 2001, shortly after they were threatened by Defendant Augusto Jimenez, Locarno and Orcasita were pulled off a Drummond company bus and murdered by paramilitaries of the AUC. Some of these paramilitaries were themselves members of the regular military and were getting direct support from the regular military. The paramilitaries who killed Locarno and Orcasita were working as agents or employees of Defendants at the time.

50.     The paramilitaries boarded the bus and asked for Locarno and Orcasita by name, saying that these two "had a problem with Drummond." The paramilitaries made the workers produce their identification cards. When Locarno was identified by the paramilitaries, he was pulled off the bus and shot in the head several times in front of the other workers. Orcasita was then identified. He was tied up and thrown in the paramilitaries' vehicle. He was found dead by the side of the road several hours later, shot in the head. He had been tortured before he was murdered. There were cuts on his chest, and his teeth had been knocked out. Both because some of the regular military in the area were involved in the executions as

members of the paramilitaries, and because the regular military stationed at the Drummond compound allow the paramilitaries to operate with impunity, no action was taken to bring those responsible for the murders of Locarno and Orcasita to justice.

51.    Subsequent to the murders of Locarno and Orcasita, their families received threats to keep quiet about the murders.

52.    Soler eventually stepped up to assume the position of President of the Union. He renewed negotiations with Drummond and specifically sought to obtain new security arrangements for the workers, especially in light of the murder of Locarno and Orcasita. He and the other leaders of SINTRAMIENERGETICA sent a letter to Defendant Garry Drummond renewing the demand to allow the workers to have sleeping facilities at the mine site. Again, this request was denied. In addition, Soler publicly denounced the murders of Locarno and Orcasita and publicly stated his belief that someone at the La Loma mines must have told the paramilitaries which specific bus was carrying them on the fateful night of March 12, 2001. Meanwhile, threats against Soler's life and the lives of other union leaders continued.

53.    On October 5, 2001, shortly after assuming the position of President of the Union, Soler himself was murdered by paramilitaries of the AUC. Just as

Locarno and Orcasita, Soler was captured by paramilitaries on his way back home from the La Loma mines. Thus, after leaving work around 2:30 in the afternoon, Soler was left by the escorts he was using for security at the transport terminal near the mines in the city of Valledupar. He then boarded a public bus traveling toward his home town of Chiriguana. While in transit, the bus he was on was stopped by paramilitaries which drove in the path of the bus with a white truck and parked the truck in front of the bus. The paramilitaries boarded the bus and called Soler by name. They then removed him from the bus. On October 7, the body of Soler was found in a nearby area by farmers. His body showed signs of torture and he had been shot twice in the head.

## VI.  DEFENDANTS' VIOLATIONS OF LAW

54.  Defendants' actions violate, and Plaintiffs' causes of action arise from, the following laws, agreements, conventions, resolutions and treaties, which constitute specific examples of the applicable law of nations or customary international law:

a) Alien Tort Claims Act, 28 U.S.C. § 1350;

b) Torture Victim Protection Act, 28 U.S.C. § 1350;

c) Common law of the United States of America;

d) United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

e) Universal Declaration of Human Rights, G.A. Res. 217A(iii), U. N. Doc. A/810 (1948);

f) International Covenant on Civil and Political Rights, G.A. Res. 2220(A)(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N.Doc. A/6316 (1966);

g) Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984) (ratified 10/28/98);

h) Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

i) Vienna Declaration and Programme of Action (World Conference on Human Rights, 1993);

j) International Labor Organization Conventions 87 and 98, which protect the fundamental rights to associate and organize;

k) Article 3 of the Geneva Conventions; and

l) Statutes and common law of Colombia including but not limited to, wrongful death, negligence, and recklessness.

## VII.  CAUSES OF ACTION

### First Cause of Action

### The Alien Tort Claims Act, 28 U.S.C. § 1350
### For Extrajudicial Killing on Behalf of
### All Plaintiffs Against All Defendants

55.    Plaintiffs incorporate by reference paragraphs 1 through 54 of this Complaint as is set forth herein.

56.    Defendants Drummond Company, Inc. and Drummond Ltd. engaged in acts and omissions intentionally and tortuously causing their employees and/or agents to murder Locarno, Orcasita, and Soler. Specifically, as is alleged above, the Defendant companies' employees and/or agents, including Defendant Augusto Jimenez, Defendant Alfredo Araujo, Pedro Maya, and Richardo Urbina engaged in joint action with, and/or conspired with, paramilitary forces that were operating under color of law, and, so acting, murdered Locarno, Orcasita and Soler. Further, through their employees and/or agents, including Augusto Jimenez, Alfredo Araujo, Pedro Maya, and Ricardo Urbina, the Defendant companies knowingly aided and abetted the paramilitary forces that murdered Locarno, Orcasita, and Soler by providing financial support, supplies, access, and other substantial assistance that contributed to the ability of the paramilitary forces to murder Locarno, Orcasita and Soler.  Defendants realized substantial benefits from the murders of Locarno, Orcasita and Soler, including the de-stabilization of

SINTRAMIENERGETICA and the avoidance of financial obligations to members of the union. As noted by the ICFTU, the "[t]rade union activists affiliated to the Union of Workers of the Mining and Energy Industry of Colombia [SINTRAMIENERGETICA] and working at mines run by the US multinational Drummond have been particularly severely affected by the violence that occurred throughout 2001."

57.    The aforesaid acts violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph ¶54, *supra*. The acts described herein are actionable under ATS, and, if such a showing is required, were done with the complicity of state actors. The paramilitary security forces in the Cesar Province are permitted to exist, openly operate under the laws of Colombia, and are assisted by government military officials. In engaging in joint action and/or a conspiracy with such paramilitary agents and other state government officials, Defendants acted under color of law in violating each of the applicable laws, agreements, conventions, resolutions and treaties listed in paragraph ¶54, *supra*. Further, the Government of Colombia fails to enforce its laws that would prevent or remedy the violations alleged herein.

58.    Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but

not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph ¶54, *supra*, resulted in the deaths of Locarno, Orcasita and Soler. Defendants are jointly and severally liable for the acts of any and all subsidiaries that are in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph ¶54, *supra*. Defendants are also vicariously liable for any violations of their employees or agents of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph ¶54, *supra*.

59.    Plaintiffs are all legal beneficiaries following the murders of their fathers under federal common law, international law, and the law of Colombia, and all have standing to sue to recover their personal damages following the extrajudicial killings of their fathers. Plaintiffs have suffered damages, including emotional harm, loss of companionship and financial support, as a result of the murders of Locarno, Orcasita, and Soler. These Plaintiffs seek compensatory and punitive damages in amounts to be ascertained at trial for the harm they have suffered individually as well as for the harm suffered by Locarno, Orcasita and

Soler leading up to and during their murders and for their loss of life.   The

Plaintiffs further seek equitable relief to prevent further human rights violations.

### Second Cause of Action

### The Torture Victim Protection Act, 28 U.S.C. § 1350
### For Extrajudicial Killing on Behalf of
### All Plaintiffs Against All Defendants

60.     Plaintiffs incorporate by reference paragraphs 1 through 59 of this

Complaint as is set forth herein.

61.     Defendants Drummond Company, Inc. and Drummond Ltd engaged

in acts and omissions intentionally and tortuously causing their employees and/or

agents to murder Locarno, Orcasita and Soler.   Specifically, as is alleged above,

the Defendant companies' employees and/or agents, including Defendant Augusto

Jimenez, Defendant Alfredo Araujo, Pedro Maya, and Ricardo Urbina, engaged in

joint action with, and/or conspired with, paramilitary forces that were operating

under color of law, and, so acting, murdered Locarno, Orcasita and Soler in

violation of the TVPA.   Further, through their employees and/or agents, including

Augusto Jimenez, Alredo Araujo, Pedro Maya, and Ricardo Urbina, the Defendant

companies knowingly aided and abetted the paramilitary forces that murdered

Locarno, Orcasita and Soler by providing financial support, supplies, access, and

other substantial assistance that contributed to the ability of the paramilitary forces

to murder Locarno, Orcasita and Soler.

62.    Defendants realized substantial benefits from the murders of Locarno,

Orcasita and Soler, including the de-stabilization of SINTRAMIENERGETICA

and the avoidance of financial obligations to members of the union. As noted by

the ICFTU, the "[t]rade union activists affiliated to the Union of Workers of the

Mining and Energy Industry of Colombia [SINTRAMIENERGETICA] and

working at mines run by the US multinational Drummond have been particularly

severely affected by the violence that occurred throughout 2001."

63.    The aforesaid acts violate the law of nations, customary international

law, and worldwide industry standards and practices, including, but not limited to,

the specific laws, agreements, conventions, resolutions and treaties listed in

paragraph ¶54, *supra*. The acts described herein are actionable under the TVPA,

and, if such a showing is required, were done with the complicity of state actors.

The paramilitary security forces of the Cesar Province are permitted to exist,

openly operate under the laws of Colombia, and are assisted by government

officials and the Colombian military. In engaging in joint action and/or a

conspiracy with such paramilitary agents and other state government officials,

Defendants acted under color of law in violating each of the applicable laws,

agreements, conventions, resolutions and treaties listed in paragraph ¶54, *supra*.

Further, the Government of Colombia fails to enforce its laws that would prevent or remedy the violations alleged herein.

64.    Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph ¶54, *supra*, resulted in the deaths of Locarno, Orcasita and Soler.   Defendants are jointly and severally liable for the acts of any and all subsidiaries that are in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph ¶54, *supra*.   Defendants are also vicariously liable for any violations of their employees or agents of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph ¶54, *supra*.


65.    Plaintiffs are all legal beneficiaries following the murders of their fathers under federal common law, international law, and the law of Colombia, and all have standing to sue to recover their personal damages following the extrajudicial killings of their fathers. Plaintiffs have suffered damages, including

emotional harm, loss of companionship and financial support, as a result of the murders of Locarno, Orcasita and Soler. Plaintiffs seek compensatory and punitive damages in amounts to be ascertained at trial for the harm they have suffered individually as well as for the harm suffered by Locarno, Orcasita and Soler leading up to and during their murders and for their loss of life. The Plaintiffs further seek equitable relief to prevent further human rights violations.

## Third Cause of Action

### Wrongful Death on Behalf of All Plaintiffs Against All Defendants

66.     Plaintiffs incorporate by reference paragraphs 1 through 65 of this Complaint as is set forth herein.

67.     Defendants Drummond Company, Inc. and Drummond Ltd. committed, or acted in concert to commit, or Defendants' employees or agents, committed acts that constitute wrongful death under the laws of Colombia, and that caused the deaths of Locarno, Orcasita and Soler.

68.     Defendants' actions and omissions were a direct and substantial cause of the deaths of Locarno, Orcasita and Soler. Defendants failed to use due care to protect them from injury and harm, thereby proximately causing their wrongful deaths.

69.     Plaintiffs are all legal beneficiaries following the murders of their fathers under federal common law, international law, and the law of Colombia and

all have standing to sue for wrongful death. They have suffered damages, including emotional harm, loss of companionship and financial support, as a result of the murders of Locarno, Orcasita and Soler. Plaintiffs seek compensatory and punitive damages in amounts to be ascertained at trial for the harm they have suffered individually as a result of the murders of Locarno, Orcasita and Soler. The Plaintiffs further seek equitable relief to prevent further human rights violations.

## VIII.  DEMAND FOR JURY TRIAL

70.    Plaintiffs demand a trial by jury on all issues so triable.

## IX.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to:

(a)    enter judgment in favor of Plaintiffs on all counts of the Complaint;

(b)    declare that Defendants have violated Plaintiffs' human rights and the laws of the State of the United States and Colombia, as set forth herein;

(c)    award Plaintiffs compensatory and punitive damages;

(d)    grant Plaintiffs equitable relief, permanently enjoining Defendants from further engaging in human rights abuses against Plaintiffs and other members of SINTRAMIENERGETICA;

(e)     award Plaintiffs the costs of suit including reasonable attorneys'

fees; and

(f)     award Plaintiffs such other and further relief as the Court deems

just under the circumstances.

Respectfully submitted this **20th** day of March, 2009.

**Garve W. Ivey, Jr.**
**garve@iveylawyers.com**
**The Ivey Law Firm**
**315 West 19th Street**
**Jasper, AL 35502-1349**
**205-221-4644**
*Attorneys for Plaintiffs*

**OF COUNSEL:**

**Terrence P. Collingsworth**
**tc@conradscherer.com**
**Conrad & Scherer, LLP**
**731 8th Street, SE**
**Washington, DC 20003**
**202-543-4001**

**William R. Scherer**
**wrs@conradscherer.com**
**633 South Federal Highway**
**Ft. Lauderdale, FL 33301**
**954-462-5500**